57 F.3d 1101
 313 U.S.App.D.C. 16
 Darryl COVINGTON; Tracy Dew-Bey; David Edwards; Lee Roy
Ferguson; Raymond Gant; Charles Harris; Donald
Hunt; Larry Lee; Leo Wright; and
Charles Barber, Appellees,
v.
DISTRICT OF COLUMBIA; R. Barnes; James Bryant; P.D.
Bullock; L.C. Childs; D.P. Dalton; H. King; Robert
Newkirk; M.L. Randle; G.M. Cutler; R. Jackson; R.
Nickens; F. Schuler; L.D. Johnson; D.E. Marshall; L.
Sesse-Khalid; Rita Goodall; Other Correctional Officers;
Other Unknown Present or Former District of Columbia Lorton
Correctional Facility Officers, Appellants.
 Nos. 94-7014, 94-7015, 94-7022 and 94-7107.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 18, 1995.
Decided June 23, 1995.
Rehearing and Suggestion for Rehearing In Banc Denied Sept.
12, 1995.*
 
 Appeal from the United States District Court for the District of Columbia (Civ. No. 87cv02658).
 Donna M. Murasky, Asst. Corp. Counsel, Washington, DC, argued the cause, for appellants. With her on the briefs were Vanessa Ruiz, Corp. Counsel at the time of filing of appellant's brief, Charles L. Reischel, Deputy Corp. Counsel, and Erias A. Hyman, Acting Corp. Counsel, Washington, DC. John A. Payton, Washington, DC, entered an appearance.
 Roger E. Warin, Washington, DC, argued the cause, for appellees. With him on the joint brief were Mindy A. Kaiden, Michael J. Gaffney, Daniel M. Schember, Vicki Golden, and David Cashdan, Washington, DC.
 Before: EDWARDS, Chief Judge, WALD and HENDERSON, Circuit Judges.
 Dissenting opinion filed by Circuit Judge HENDERSON.
 HARRY T. EDWARDS, Chief Judge:
 
 
 1
 This appeal involves consolidated challenges to attorneys' fee awards granted under 42 U.S.C. Sec. 1988 (1988 & Supp. V 1993) in favor of prevailing parties (collectively "plaintiffs") in three civil rights cases against the District of Columbia ("District"). In support of the fee claims, the plaintiffs' attorneys submitted to the District Court declarations describing their billing practices--explaining that when they do bill clients, they charge reduced rates for non-economic, public-spirited reasons--as well as information indicative of their skill, experience, and reputation. They also submitted evidence of the prevailing market rates for complex federal litigation in the District of Columbia. The District opposed plaintiffs' fee applications, claiming that plaintiffs' requested rates were substantially higher than rates charged by similarly experienced attorneys who litigate civil rights and employment discrimination cases in the District of Columbia. In support of its position, the District submitted an affidavit of the Assistant Deputy Corporation Counsel, who recounted rates charged by nine plaintiff attorneys and contended that those rates more accurately reflected prevailing market rates. The District Court disagreed.
 
 
 2
 The District Court found that plaintiffs' attorneys intentionally charged their poorer clients reduced rates for non-economic, public-spirited reasons. The record indicates plaintiff counsels' years of legal experience as well as their ability to handle complicated federal cases. The court found that the relevant market was complex federal litigation and that plaintiffs' requested rates were in line with those prevailing in the District of Columbia for similar services by lawyers of reasonably comparable skill, experience, and reputation. Thus, relying on established law, the District Court granted plaintiffs' motion for reasonable attorneys' fees. Finding no abuse of discretion, we affirm the judgments of the District Court.
 
 
 3
 In section 1988 attorneys' fee cases, attorneys who customarily charge reduced fees reflecting non-economic, public-spirited goals may seek fees based on the prevailing market rates if the prevailing party demonstrates the reasonableness of the requested hourly rates. That burden entails the following: first, if the attorney customarily charges clients lower rates than plaintiff has requested under section 1988, the attorney must demonstrate that the customarily reduced rates are charged for non-economic reasons; second, the attorney must offer information documenting his or her skill, experience, and reputation; and third, the attorney must produce evidence of the prevailing market rates in the relevant community for attorneys of comparable skill, experience, and reputation. In the instant cases, plaintiffs met this burden, and the District offered little by way of rebuttal. Accordingly, the District Court did not err in finding plaintiffs' requested rates reasonable and granting the motions for attorneys' fee awards. Nor did the District Court err in determining that complex federal litigation was the relevant market for purposes of establishing the prevailing market rates in the District of Columbia. Accordingly, we affirm the District Court's attorneys' fee awards in all three cases.
 
 I. BACKGROUND
 
 4
 In these consolidated cases, plaintiffs supported their motions for attorneys' fees by submitting evidence of their attorneys' billing practices, their attorneys' legal experience, skill, and reputation, and the prevailing market rates for complex federal litigation in the District of Columbia. Plaintiffs' motions were granted in all three cases. Although each case involved a different claim--Covington v. District of Columbia, 839 F.Supp. 894 (D.D.C.1993), was a prisoners' rights case; Sexcius v. District of Columbia, 839 F.Supp. 919 (D.D.C.1993), was a First Amendment case; and Galloway v. Superior Court, Civ. Action No. 91-0644, 1994 WL 162410 (D.D.C. Apr. 21, 1994), was a handicap discrimination case--and each was brought by different attorneys, the plaintiffs in each case submitted substantially similar evidence. A detailed review of the evidence presented in Covington will suffice to provide the necessary foundation for our analysis.[1]
 
 
 5
 Attorneys for the plaintiffs in Covington brought a section 1983 action on behalf of ten prison inmates who were beaten while shackled and handcuffed and nine inmates who were sent to a maximum security facility without proper hearings. Covington, 839 F.Supp. at 895. The jury found for the plaintiffs, the District appealed, and then the parties settled while the appeal was pending. Id. The settlement provided that plaintiffs were entitled to an attorneys' fee award; but when the parties could not agree on the appropriate hourly rate, the plaintiffs filed a motion for attorneys' fees.
 
 
 6
 Plaintiffs' fee application included information pertaining to counsels' billing practices; their experience, skill, and reputation; and the prevailing market rates for complex federal litigation in the District of Columbia. Specifically, the lead attorneys in the case, Michael Gaffney and Daniel Schember, submitted declarations, explaining that they compose a two-attorney firm which handles federal court litigation concerning civil rights and civil liberties, military and veterans law, employment and labor law, and administrative proceedings. According to their declarations, Gaffney and Schember choose clients and cases based on "commitments to the clients and to the constitutional and statutory rights at issue," Declaration of Michael J. Gaffney at 5, Joint Appendix (J.A.) at I-163, and they offer needy clients reduced or below-market rates for these non-economic reasons.[2] The ten inmate plaintiffs in Covington were indigent. As Schember's declaration explains, the lead attorneys took the case "to seek to enforce the constitutional prohibition against punitive beating of prisoners." Declaration of Daniel M. Schember at 6, J.A. at I-155. Gaffney's and Schember's declarations each recount their significant experience since 1975, at the Lawyers Committee for Civil Rights Under Law, and since 1977, at their own firm, practicing federal court litigation on a variety of issues.[3] Their declarations also provide indications of their reputations, listing teaching positions[4] and fellowships,[5] awards received,[6] participation in congressionally mandated studies,[7] and chairing the D.C. Bar's Committee on Military and Veterans Rights.[8]
 
 
 7
 Two other attorneys in the Covington case, Linda Delaney and Mark Hager, also submitted declarations regarding their billing practices and experience. Delaney's declaration revealed that when she bills clients, she charges below-market prices for non-economic reasons.[9] Declaration of Linda A. Delaney at 5-6, J.A. at I-189-90. Delaney, who has practiced law since 1984, submitted descriptions of eight federal civil rights or employment cases in which she was involved as well as actions brought in District of Columbia courts. Declaration of Delaney at 2-3, J.A. at I-186-87. Hager, who holds a J.D. and a Ph.D. from Harvard and currently teaches law at American University, stated that he does not have a standard hourly rate for litigation. Declaration of Mark M. Hager at 1, 3, J.A. at I-191, I-193. He practiced law full time for one year at a Boston law firm, doing commercial and criminal defense litigation, and since 1987, when he began teaching full time, he has represented clients in political asylum cases, employment cases, prisoners' rights cases, and has acted as a commercial arbitrator. Declaration of Hager at 1-3, J.A. at I-191-93. In addition, plaintiffs used the services of two law graduates and two law students. Covington, 839 F.Supp. at 900-01.
 
 
 8
 The Covington plaintiffs submitted a good deal of evidence establishing the prevailing market rates for comparably experienced attorneys handling complex federal litigation. They submitted the original Laffey matrix, a schedule of charges based on years of experience developed in Laffey v. Northwest Airlines, Inc., 572 F.Supp. 354 (D.D.C.1983), rev'd on other grounds, 746 F.2d 4 (D.C.Cir.1984), cert. denied, 472 U.S. 1021, 105 S.Ct. 3488, 87 L.Ed.2d 622 (1985).[10] Plaintiffs also submitted affidavits attesting to increases in the market rates since the original Laffey matrix was established; the U.S. Attorney's Office version of the updated Laffey matrix; the memorandum opinions in Robles v. United States, Civ. Action No. 84-3635, (D.D.C. Jan. 10, 1992), J.A. at I-119, and Fischbach v. District of Columbia, Civ. Action No. 87-0646 (D.D.C. Jan. 3, 1993), J.A. at I-254, in which district courts awarded fees based, in part, on the Laffey matrix; and an EEOC decision, Hatfield v. Garrett, Appeal No. 01892909 (E.E.O.C. Sept. 26, 1990), J.A. at I-90, in which the EEOC awarded attorneys' fees using the updated Laffey matrix.[11]
 
 
 9
 Based on this evidence, plaintiffs requested fees for Schember and Gaffney at a rate of $260 per hour, which represented the 1993 prevailing market rate[12] for experienced federal court litigators with eleven to nineteen years of experience in an updated version of the Laffey matrix[13] and the U.S. Attorney's Office matrix.[14] Plaintiffs requested attorneys' fee awards at an hourly rate of $160 for Delaney and Hager, which represents a rate just under that suggested by the U.S. Attorney's Office matrix for attorneys with four to seven years experience. Finally, plaintiffs requested that the two law graduates be awarded $85 per hour (less than the prevailing market rate of $125 under the U.S. Attorney's Office matrix), and that the two law students be awarded $70 per hour (the prevailing market rate for paralegals and law clerks under the U.S. Attorney's Office matrix). See Covington, 839 F.Supp. at 900-03.
 
 
 10
 The District opposed plaintiffs' request for attorneys' fees, arguing that a submarket of plaintiff attorneys who handle civil rights and employment discrimination cases existed, and that the prevailing market rate for this submarket of attorneys with between ten and twenty years of experience was well below that requested by plaintiffs in this case. In support, the District submitted the declaration of Michael Zielinski, Assistant Deputy Corporation Counsel in the Civil Division of the Office of Corporation Counsel, who recounted plaintiffs' requests for attorneys' fees in nine cases brought by solo practitioners or small firms against the District of Columbia. Zielinski Declaration at 2-7, J.A. at I-218-23. Zielinski suggested that there were "a large number of attorneys in the District's legal marketplace who ... litigate complex cases like employment discrimination and civil rights actions and who have established hourly billing rates at or near $150." Zielinski Declaration at 8, J.A. at I-224. A majority of the nine plaintiff attorneys identified by Zielinski had requested attorneys' fees at their usual billing rates; and two of the attorneys had sought market rates akin to those in the Laffey matrix.
 
 
 11
 The District Court found for plaintiffs and awarded them the requested attorneys' fees. The trial judge noted that, because the Covington "plaintiffs' assertions that their counsel have taken public interest cases for below-market rates are reasonably well-documented" and that these assertions were "virtually unchallenged," the court would "take plaintiffs at their word." Covington, 839 F.Supp. at 897. The District Court Judge also noted that "[p]laintiffs' counsel handled very well this complicated federal case, which involved the constitutional claims of ten plaintiffs against sixteen defendants, lengthy discovery, many motions and a jury trial." Id. at 895. The District Court found that plaintiffs presented "sufficiently persuasive evidence charting the prevailing market rates of litigators of complex federal matters." Id. at 898. In reviewing the evidence plaintiffs submitted on the prevailing market rates, the District Court noted that the Laffey matrix had been "relied upon, at least in part, by six District of Columbia district judges and that [it had] received a degree of approval" from this court in Save Our Cumberland Mountains, Inc. v. Hodel, 857 F.2d 1516, 1525 (D.C.Cir.1988) (en banc ). Id. (citations omitted). The court also reviewed the fee matrix "developed by the U.S. Attorney's Office for the District of Columbia that the U.S. Attorney relies upon in settlements." Id. In short, the trial court found that plaintiffs met their evidentiary burden, and that defendants' factual rebuttal of plaintiffs' evidence was ineffectual. Id. at 899-900.
 
 
 12
 The District Court found the District's evidence unpersuasive: "Defendants' sole affidavit ... cites only seven instances in which lawyers with 10-20 years of experience charged about $150 per hour in representing plaintiffs in civil rights, employment, or discrimination matters. Standing alone, these seven instances are insufficient to demonstrate that $150 per hour is the prevailing rate across the District of Columbia in this sub-market." Id. at 898. Finally, the District Court rejected the District's submarket theory, noting that the District had failed to convince the court "that lawyers handling civil rights, employment, or discrimination cases for plaintiffs constitute a sub-market of their own," and that "the prevailing rate in the sub-market ... is--as defendants claim--lower than the rate prevailing in the broader legal market" of complex federal litigation. Id. at 898 & n. 8.
 
 
 13
 The District Court awarded plaintiffs attorneys' fees for Gaffney and Schember at an hourly rate of $260; for Delaney and Hager at an hourly rate of $160; for the law graduates at an hourly rate of $85; and for the law students at an hourly rate of $70. Id. at 900-02. Defendants conceded to the reasonableness of the hours claimed in plaintiffs' original motion. Id. at 903.
 
 II. ANALYSIS
 
 14
 The fee shifting provision embraced by 42 U.S.C. Sec. 1988(b), covering federal civil rights actions, provides that
 
 
 15
 the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.
 
 
 16
 In Blum v. Stenson, 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984), the Supreme Court determined that Congress intended
 
 
 17
 "reasonable fees" under Sec. 1988 are to be calculated according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or non-profit counsel.
 
 
 18
 Four years later, this court, sitting en banc, held that
 
 
 19
 the prevailing market rate method heretofore used in awarding fees to traditional for-profit firms and public interest legal services organizations shall apply as well to those attorneys who practice privately and for profit but at reduced rates reflecting non-economic goals.
 
 
 20
 Save Our Cumberland Mountains, 857 F.2d at 1524 ("SOCM" ).
 
 
 21
 This case involves a relatively straightforward application of these principles. The attorneys in the instant cases, who either practice privately and for-profit but at reduced rates reflecting non-economic goals or who have no established billing practice, request the prevailing market rates.[15] Under the Supreme Court's decision in Blum and this court's decision in SOCM, we think it is quite clear that plaintiffs' attorneys are entitled to an award based on the prevailing market rates, and we can find nothing in the records of these cases to indicate that the trial judges abused their discretion under the statute in awarding fees.
 
 A. The Attorneys' Fee Case
 
 22
 As the Supreme Court has stated, "[a] request for attorney's fees should not result in a second major litigation." Hensley v. Eckerhart, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983). "Parties to civil rights litigation in particular should make a conscientious effort, where a fee award is to be made, to resolve any differences." Blum, 465 U.S. at 902 n. 19, 104 S.Ct. at 1550 n. 19. Where settlement is not possible, case law establishes a clear structure for the determination of reasonable fees.
 
 
 23
 Under the statute, the district court is expressly empowered to exercise its discretion in determining the amount of a fee award, see 42 U.S.C. Sec. 1988(b); however, a fee applicant bears the burden of establishing entitlement to an award, documenting the appropriate hours, and justifying the reasonableness of the rates, see Blum, 465 U.S. at 896 n. 11, 104 S.Ct. at 1547 n. 11 ("[C]ourts properly have required prevailing attorneys to justify the reasonableness of the requested rate or rates."); Hensley, 461 U.S. at 437, 103 S.Ct. at 1941 ("[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates.").
 
 
 24
 As a general matter, this court has characterized the Blum formulation as constituting a three-part analysis: "(1) determination of the number of hours reasonably expended in litigation; (2) determination of a reasonable hourly rate or 'lodestar'; and (3) the use of multipliers as merited." SOCM, 857 F.2d at 1517; see also In re Donovan, 877 F.2d 982, 992 (D.C.Cir.1989); In re Olson, 884 F.2d 1415, 1423 (D.C.Cir.1989). In this case, however, only the second prong--the determination of a reasonable hourly rate--is at issue. As noted above, a fee applicant's burden in establishing a reasonable hourly rate entails a showing of at least three elements: the attorneys' billing practices; the attorneys' skill, experience, and reputation; and the prevailing market rates in the relevant community. See Blum, 465 U.S. at 896 n. 11, 104 S.Ct. at 1547 n. 11; SOCM, 857 F.2d at 1524.
 
 
 25
 First, in cases in which prevailing attorneys request rates which are greater than those they normally charge, the attorneys must offer some evidence that they charge reduced rates for public-spirited or non-economic reasons. In SOCM, the court addressed the claims of attorneys engaged in private, for-profit practice, who "adjusted fee schedules downward from pro bono or quasi public interest motives to reflect the reduced ability of the client to pay or what the attorney saw as the importance and justice of the client's cause." 857 F.2d at 1519. Building on the Supreme Court's decision in Blumwhich allowed market-rate fees for attorneys in non-profit legal services organizations--the SOCM court concluded:
 
 
 26
 Congress did not intend the private but public-spirited rate-cutting attorney to be penalized for his public spiritedness by being paid on a lower scale than either his higher priced fellow barrister from a more established firm or his salaried neighbor at a legal services clinic.
 
 
 27
 857 F.2d at 1524.
 
 
 28
 As was true in SOCM, the burden is on the fee applicant to show that the attorney's billing practices are of the sort covered by the SOCM test. That is, the attorney must show that his or her custom of charging reduced rates is in fact attributable to "public spiritedness." Implicit in this line of inquiry is the assumption that the law was not written to subsidize attorneys who charge below-market rates because they cannot command anything more. And a defendant is free to rebut a fee claim on these terms in cases in which the issue is posed. We recognize that, in some cases, this may be a difficult line of inquiry, for an attorney who cannot command market rates invariably will have a "custom" of charging rates below the market. This problem is diminished with respect to attorneys who charge variable rates (both at and below the market, with the latter attributable to public-spirited goals). In any event, it is within the sound discretion of the district court to weigh the evidence to determine whether an attorney customarily charges reduced rates for non-economic reasons.
 
 
 29
 Second, prevailing parties must offer evidence to demonstrate their attorneys' experience, skill, reputation, and the complexity of the case they handled. In articulating the plaintiffs' burden in these cases, the Supreme Court required that fee applicants "produce satisfactory evidence--in addition to the attorney's own affidavits--that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." Blum, 465 U.S. at 896 n. 11, 104 S.Ct. at 1547 n. 11.[16] To some extent, this second element of the reasonable-rate analysis informs the first element of the inquiry, for as the SOCM court noted: "We do not propose ... that all attorneys be remunerated at the same rate, regardless of their competence, experience, and marketability. We only aim to provide that their experience, competence, and marketability will be reflected in the rate at which they are in fact remunerated."[17] 857 F.2d at 1521 n. 4.
 
 
 30
 Third, plaintiffs must produce data concerning the prevailing market rates in the relevant community for attorneys of reasonably comparable skill, experience, and reputation. This is undoubtedly a difficult assessment, and the Supreme Court has so acknowledged:
 
 
 31
 We recognize, of course, that determining an appropriate "market rate" for the services of a lawyer is inherently difficult. Market prices of commodities and most services are determined by supply and demand. In this traditional sense there is no such thing as a prevailing market rate for the service of lawyers in a particular community. The type of services rendered by lawyers, as well as their experience, skill, and reputation, varies extensively--even within a law firm. Accordingly, the hourly rates of lawyers in private practice also vary widely.
 
 
 32
 Blum, 465 U.S. at 895 n. 11, 104 S.Ct. at 1547 n. 11. However, as this court stated in National Ass'n of Concerned Veterans v. Secretary of Defense, 675 F.2d 1319, 1325 (D.C.Cir.1982), "[t]he complexity of the market for legal services does not ... reduce the importance of fixing the prevailing hourly rate in each particular case with a fair degree of accuracy."
 
 
 33
 The Supreme Court's decision in Blum establishes the framework for analysis:
 
 
 34
 To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence--in addition to the attorney's own affidavits--that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation. A rate determined in this way is normally deemed to be reasonable, and is referred to--for convenience--as the prevailing market rate.
 
 
 35
 Blum, 465 U.S. at 896 n. 11, 104 S.Ct. at 1547 n. 11. The Court also noted that "rates charged in private representations may afford relevant comparisons." Id.; see also Missouri v. Jenkins, 491 U.S. 274, 286, 109 S.Ct. 2463, 2470, 105 L.Ed.2d 229 (1989) ("A reasonable attorney's fee under Sec. 1988 is one calculated on the basis of rates and practices prevailing in the relevant market ... and one that grants the successful civil rights plaintiff a 'fully compensatory fee,' ... comparable to what 'is traditional with attorneys compensated by a fee-paying client.' ") (citations omitted).
 
 
 36
 In order to demonstrate this third element, plaintiffs may point to such evidence as an updated version of the Laffey matrix or the U.S. Attorney's Office matrix, or their own survey of prevailing market rates in the community. In SOCM, we approved of the district court's reliance, at least in part, on the schedule of prevailing rates compiled in Laffey. Although the SOCM court remanded the case to the district court for the limited purpose of making new findings as to reasonable hourly rates at the time the services were performed, it stated:
 
 
 37
 We do not intend, by this remand, to diminish the value of the fee schedule compiled by the District Court in Laffey. Indeed, we commend its use for the year to which it applies. Perhaps the most desirable result of the present litigation would be the compiling of a similar schedule of prevailing community rates for other relevant years.
 
 
 38
 SOCM, 857 F.2d at 1525. Although fee matrices are somewhat crude--the Laffey matrix, for example, lumps attorneys with four to seven years of experience in the same category; attorneys with eleven to nineteen also share the same hourly rate[18]--the matrices do provide a useful starting point. To supplement any matrix that has been offered, plaintiffs may also provide surveys to update the matrix; affidavits reciting the precise fees that attorneys with similar qualifications have received from fee-paying clients in comparable cases; and evidence of recent fees awarded by the courts or through settlement to attorneys with comparable qualifications handling similar cases.
 
 
 39
 "When ... the applicant for a fee has carried his burden of showing that the claimed rate and number of hours are reasonable, the resulting product is presumed to be the reasonable fee contemplated by Sec. 1988." Blum, 465 U.S. at 897, 104 S.Ct. at 1548. At this point, the defendant may challenge the plaintiffs' application for attorneys' fees, but the Government's burden in rebuttal is not without demands:
 
 
 40
 Once the fee applicant has provided support for the requested rate, the burden falls on the Government to go forward with evidence that the rate is erroneous. And when the Government attempts to rebut the case for a requested rate, it must do so by equally specific countervailing evidence. Although there may be occasions in which the applicant's showing is so weak that the Government may without more simply challenge the rate as unsubstantiated, in the normal case the Government must either accede to the applicant's requested rate or provide specific contrary evidence tending to show that a lower rate would be appropriate.
 
 
 41
 Concerned Veterans, 675 F.2d at 1326.
 
 
 42
 Defendants may challenge any part of the prevailing parties' case for attorneys' fees. For example, defendants may challenge the plaintiff attorneys' claims that they charge reduced rates for non-economic reasons, and this might include a claim that under no circumstances would that particular plaintiff's attorney ever command the rates he or she requests. Defendants also may challenge the plaintiff attorneys' claims as to their competence, experience, reputation, or performance in the instant case. Finally, defendants may challenge plaintiff attorneys' market data, in an effort to show that the submitted market rates are inaccurate.
 
 B. The Claims in this Case
 
 43
 Our review function in this case is limited, for district courts act with a real measure of discretion in granting a fee award under section 1988. See Blum, 465 U.S. at 902 n. 19, 104 S.Ct. at 1550 n. 19 ("A district court is expressly empowered to exercise discretion in determining whether an award is to be made and if so its reasonableness."); Kattan by Thomas v. District of Columbia, 995 F.2d 274, 278 (D.C.Cir.1993) ("A district court's discretion as to the proper hourly rate to award counsel should not be upset absent clear misapplication of legal principles, arbitrary fact finding, or unprincipled disregard for the record evidence."); Copeland v. Marshall, 641 F.2d 880, 901 (D.C.Cir.1980) (en banc ) ("It is common learning that an attorney's fee award by the District Court will be upset on appeal only if it represents an abuse of discretion."). This limited standard of review is "appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." Hensley, 461 U.S. at 437, 103 S.Ct. at 1941.
 
 
 44
 In this case, plaintiffs clearly met their burden and their requested rates were properly accorded a presumption of reasonableness. Plaintiffs submitted their counsels' declarations attesting that they charged below-market rates for non-economic, public-spirited reasons.[19] Plaintiffs submitted data demonstrating their attorneys' experience in the legal profession and in litigating complex federal court cases, as well as information probative of their attorneys' skill and reputation. Finally, plaintiffs submitted a great deal of evidence regarding prevailing market rates for complex federal litigation. This included the Laffey matrix, the U.S. Attorney's Office matrix, affidavits attesting to increases in the market rates since the original Laffey matrix, and memorandum opinions in district court cases which relied on these matrices.
 
 
 45
 The District, on the other hand, submitted little in rebuttal. First, the District attempted to challenge plaintiffs' requested hourly rates by suggesting that these rates were higher than the established billing rates of attorneys who litigate complex federal cases. In support, the District submitted a single declaration from an Assistant Deputy in its office recounting cases which, for the most part, were inapposite to the case at bar: attorneys in a majority of those cases never requested fees at prevailing market rates; nor did they suggest that they charged below-market rates for non-economic reasons; rather they simply sought the rates at which they typically billed clients. See Zielinski Declaration at 3-8, J.A. at I-219-24. One of the attorneys mentioned in Zielinski's declaration requested and received prevailing market rates in line with the Laffey matrix. See id. at 8, J.A. at I-224; Fischbach v. District of Columbia, Civ. Action No. 87-0646 (D.D.C. Jan. 3, 1993), J.A. at I-254. Simply put, although the District does not bear the ultimate burden in this case, its evidence did not come close to rebutting the presumption of reasonableness plaintiffs established. The District Court therefore correctly "rel[ied] solely upon plaintiffs' unrebutted evidence." Covington, 839 F.Supp. at 900.
 
 
 46
 Second, the District attempted to argue that plaintiffs are only entitled to the rates they regularly charge, i.e., that these rates are in fact the prevailing market rates. This argument was considered and rejected by this court in SOCM, and, therefore, merits little attention here. As the SOCM court stated, "[t]he result sought by plaintiffs, that is a fee award based on prevailing market rates rather than the actual rates of [plaintiffs' attorneys], is not only not inconsistent with the express intent of Congress, but rather accomplishes Congress' express goals."[20] 857 F.2d at 1521. Thus, the en banc court concluded: "Henceforth, the prevailing market rate method heretofore used in awarding fees to traditional for-profit firms and public interest legal services organizations shall apply as well to those attorneys who practice privately and for profit but at reduced rates reflecting non-economic goals." Id. at 1524. The District Court properly dismissed the District's argument that plaintiffs are only entitled to an award based on the fees their attorneys routinely charge clients.
 
 
 47
 Finally, the District argues that the court should define the relevant market, for purposes of determining the prevailing market rates, narrowly, as including only plaintiff attorneys in civil rights, employment, or discrimination actions. Covington, 839 F.Supp. at 897. The District Court rejected this narrow definition, noting that the District failed to show that a civil rights and employment discrimination market actually exists independent of attorneys who handle other types of complex federal litigation. Id. at 898 n. 8. And even assuming, arguendo, the existence of such a submarket, the trial court found no evidence that submarket rates are lower than the prevailing rates in the broader legal market. Id. at 898. The District only weakly challenges this determination on appeal,[21] so we are hard-pressed to find even a compelling argument to address.
 
 
 48
 The Senate Report accompanying the enactment of section 1988 suggests that Congress envisioned rates to be set according to standards in other types of complex federal litigation: "It is intended that the amount of fees awarded under [Sec. 1988] be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases[,] and not be reduced because the rights may be nonpecuniary in nature." Blum, 465 U.S. at 893, 104 S.Ct. at 1546 (quoting S.REP. NO. 1011, 94th Cong., 2d Sess. 6 (1976), U.S.Code Cong. & Admin.News 1976, pp. 5908, 5913).[22] The point is that "Congress after all did not simply express its intent that the fees would attract counsel, but rather that they would be 'adequate to attractcompetent counsel.' " SOCM, 857 F.2d at 1521 (quoting S.REP. NO. 1011 at 6, U.S.Code Cong. & Admin.News 1976, at 5913).
 
 
 49
 In short, we can find no basis to overturn the District Court's determination that the relevant market is that of complex federal litigation.
 
 III. CONCLUSION
 
 50
 For the foregoing reasons, we hold that the District Court did not abuse its discretion in awarding plaintiffs reasonable attorneys' fees in these consolidated cases.
 
 
 51
 So ordered.
 
 
 52
 KAREN LeCRAFT HENDERSON, Circuit Judge, dissenting:
 
 
 53
 The Supreme Court has made clear that federal fee shifting statutes "were not designed as a form of economic relief to improve the financial lot of lawyers." Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 565, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986). The majority nonetheless affirms fee awards totalling nearly $664,000 in public funds calculated on the basis of premium hourly rates. I respectfully dissent because none of the plaintiffs has demonstrated as required by our previous opinions that the rates awarded prevail for the type of work performed or that the rates their lawyers have historically been able to secure from paying clients are not determinative of a "reasonable hourly rate." Blum v. Stenson, 465 U.S. 886, 888, 104 S.Ct. 1541, 1544, 79 L.Ed.2d 891 (1984).
 
 
 54
 The majority recognizes that a fee applicant bears the burden of justifying the reasonableness of his requested hourly rate by showing "at least three elements: the attorneys' billing practices; the attorneys' skill, experience, and reputation; and the prevailing market rates in the relevant community." Maj.Op. at 22. In my view, however, it does not follow our precedent prescribing the evidence necessary to meet that burden with respect to at least two of the elements.[1] First, "[a]n applicant is required to provide specific evidence of the prevailing community rate for the type of work for which he seeks an award." National Ass'n of Concerned Veterans v. Secretary of Defense (NACV ), 675 F.2d 1319, 1325 (D.C.Cir.1982) (emphasis added); see also Blum, 465 U.S. at 896 n. 11, 104 S.Ct. at 1547 n. 11; Copeland v. Marshall, 641 F.2d 880, 892 (D.C.Cir.1980) (en banc ) ("The reasonable hourly rate is that prevailing in the community for similar work."). The applicants have not met this burden because they rest their applications entirely on evidence of rates in the broad market of "complex federal litigation" that provides no basis for the district court[2] to determine the rate prevailing for the specific type of work performed by them.
 
 
 55
 The applicants chiefly rely on adjusted versions of the fee matrix developed more than ten years ago in Laffey v. Northwest Airlines, Inc., 572 F.Supp. 354 (D.D.C.1983), rev'd on other grounds, 746 F.2d 4 (D.C.Cir.1984); cert. denied, 472 U.S. 1021, 105 S.Ct. 3488, 87 L.Ed.2d 622 (1985). We have not considered whether the broad Laffey matrix constitutes "specific evidence" of rates charged for "similar"[3] work performed irrespective of the nature of the litigation. In my view the Laffey matrix cannot do so where, as here, the litigation is of a discrete type that appears to generate its own range of rates. For example, as demonstrated by the evidence submitted by the District of Columbia (District), "the hourly rates ... in the Laffey matrix are substantially higher than the hourly rates charged by similarly experienced attorneys who litigate employment discrimination, civil rights and other types of damages actions in the courts of the District of Columbia." Joint Appendix (JA) I-218.[4]
 
 
 56
 In my view, the district court in Covington correctly outlined the type of specific evidence required to fulfill the burden prescribed by NACV:
 
 
 57
 A statistically reliable, well-documented, and extensive survey of the rates clients pay for a certain sub-market of legal services would be powerfully persuasive. Such a survey would collect the rates of a statistically significant number of lawyers or firms within a legal sub-market, convincing the court that the survey's scope is broad enough to reflect the market faithfully. Such a survey would be sufficiently documented with supporting affidavits, assuring the court of the accuracy of the survey's data. Lastly, such a survey would encompass both the high rates that large, prestigious law firms in the area command for their work in the sub-market and the lower rates commanded by others for their work in the sub-market. (Ideally, the survey would also indicate what fraction of clients pay which rates within the sub-market's rate spectrum. That is, the survey would state what fraction of the sub-market's clients take their cases to high-priced firms, what fraction to low-priced firms, and what fraction to firms priced in the middle. This would help the court determine whether any given rate is typical or aberrant.)
 
 
 58
 Covington v. District of Columbia, 839 F.Supp. 894, 899 (D.D.C.1993) (emphasis in original).
 
 
 59
 Where the district court committed error, however, was in placing the burden of proof on the District, not the applicants.[5] Because the applicants have failed to submit evidence that carries their burden under NACV, the fee awards are in my view based on a "clear misapplication of legal principles" requiring reversal. Kattan by Thomas v. District of Columbia, 995 F.2d 274, 278 (D.C.Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1398, 128 L.Ed.2d 71 (1994). Although the majority affirms the district court's reasoning that the applicants are nonetheless entitled to the matrix-based rates they claim simply because "[t]he District ... submitted little in rebuttal," Maj.Op. at 1110,[6] the sufficiency of the District's rebuttal is relevant only if the applicants first meet their burden.
 
 
 60
 Second, in Sexcius and Galloway, the district court did not give full effect to our precedent requiring it to consider the rates customarily charged by counsel to their paying clients for whom they have not reduced their rates in the public interest. The court in NACV explained
 
 
 61
 counsel for applicants may be required to submit specific evidence of his or her actual billing practice during the relevant time period, if in fact applicant has a billing practice to report. This information, when available, will provide important substantiating evidence of the prevailing community rate.... Accordingly, the actual rate that applicant's counsel can command in the market is itself highly relevant proof of the prevailing community rate.
 
 
 62
 675 F.2d at 1326 (emphasis added, footnotes omitted). In Sexcius, counsel attested to a maximum quoted rate of $187.50 per hour. JA II-71. In Galloway, counsel indicated that the maximum rate she had been able to command was $200 per hour. JA III-51. Neither indicated that those rates had been reduced for non-economic reasons. Although the court in SOCM held that a lawyer in private practice who reduces his customary rate is not normally limited to that reduced hourly rate in fee awards, the SOCM court did not alter the significance under NACV of the full, non-reduced, rate charged by counsel to other clients.[7]
 
 
 63
 Together, NACV and SOCM instruct that a lawyer's usual hourly rate remains the most probative evidence of a reasonable rate to award him under a fee-shifting statute unless that rate does not fairly reflect the value of his services because it is a "reduced rate[ ] reflecting non-economic goals." SOCM, 857 F.2d at 1524; see also NACV, 675 F.2d at 1326; Goos v. National Ass'n of Realtors, 997 F.2d 1565, 1569 (D.C.Cir.1993); Kattan, 995 F.2d at 278 (noting "an attorney's usual billing rate is presumptively the reasonable rate"). Resort to a matrix to determine a reasonable rate is thus appropriate only if a lawyer's ordinary rate is so reduced; and, if so used, the matrix must be based on "specific evidence" of "the type of work" for which the lawyer seeks an award. NACV, 675 F.2d at 1325.
 
 
 64
 I would reverse the district court's conclusion that leap-frogged over the applicants' burden and declared instead that the District had failed to meet its burden, thereby leaving it, in its view, no alternative but to grant the applicants' requests. See, e.g., Covington, 839 F.Supp. at 898. Fee applicants are required to do more than simply ask for an award authorized by statute; they must meet a factually demanding burden. The record contains no evidence that the maximum rates previously charged by the Sexcius counsel and by Golden in Galloway had been so reduced, making their customary rates the presumptive bases for fee awards to them. Goos, 997 F.2d at 1568-69; Kattan, 995 F.2d at 278. There is, however, insufficient evidence to evaluate the claims of the other lawyers and law students who participated in the consolidated cases.[8] Accordingly, I would remand to the district court to determine whether each counsel has established a customary, non-reduced rate; if so, that rate should provide the basis of a fee award. I would further instruct the district court to determine a reasonable hourly rate for those lawyers who have not established such a rate. Its determination should be made on the basis of detailed evidence of the type it has already described so well. Covington, 839 F.Supp. at 899.
 
 
 
 *
 Williams and Henderson, Circuit Judges, would grant the suggestion; Tate, Circuit Judge, did not participate in this matter
 
 
 [1]
 For the sake of simplicity, our references to the parties and to the District Court will focus on the Covington litigation. We emphasize, however, that there are no material differences in the three cases on the principal points here in issue, and neither side suggests otherwise
 
 
 [2]
 From 1986 to 1990, Gaffney's and Schember's highest hourly rate was $125, and from 1990 to the present, their highest hourly rate was $150. They also accept clients on an attorneys' fee award or contingency fee basis. Declaration of Gaffney at 2, 12-13, J.A. at I-160, I-170-71
 
 
 [3]
 Schember and Gaffney were lead or sole counsel in several cases brought in federal district court, federal court of appeals, and the Supreme Court. Declaration of Schember at 2-5, J.A. at I-151-54; Declaration of Gaffney at 2-4, J.A. at I-160-62
 
 
 [4]
 Schember taught administrative law, constitutional law, and advanced legal research and writing at Antioch School of Law as an adjunct professor during the 1980s. Declaration of Schember at 5, J.A. at I-154
 
 
 [5]
 Gaffney received an education law fellowship from the Legal Services Corporation's Research Institute for Legal Assistance to co-author a paper on organizing the private bar to address the problems of urban education. Declaration of Gaffney at 8, J.A. at I-166
 
 
 [6]
 In 1982, the ACLU Fund of the National Capital Area awarded their firm the Alan Barth Service Award for their effort in Hobson v. Wilson, 737 F.2d 1 (D.C.Cir.1984), cert. denied, 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985). Declaration of Gaffney at 7, J.A. at I-165
 
 
 [7]
 Schember and Gaffney have participated in several federally funded inter-disciplinary policy research studies concerning implementation of federal education programs. Declaration of Gaffney at 8, J.A. at I-166
 
 
 [8]
 Gaffney also served on the board of directors of the National Veterans Legal Services Project, a non-profit organization funded by the Legal Services Corporation, Vietnam Veterans of America, and the Agent Orange Class Assistance Program. Declaration of Gaffney at 9, J.A. at I-167
 
 
 [9]
 In 1988, Delaney set her hourly rate at $125 and has not changed it. She asserted that she "essentially permit[s] [her] clients to pay what they could afford when they could afford it." Declaration of Delaney at 5, J.A. at I-189
 
 
 [10]
 The original Laffey matrix rates for 1983 were as follows:
 $175 an hour for very experienced federal court litigators, i.e., lawyers in their 20th year or more after graduation from law school;
 $150 an hour for experienced federal court litigators in their 11th through 19th years after law school graduation;
 $125 an hour for experienced federal court litigators in their 8th through 10th years after graduation from law school;
 $100 an hour for senior associates, i.e., 4 to 7 years after graduation from law school; and
 $75 an hour for junior associates, i.e., 1 to 3 years after law school graduation.
 Laffey, 572 F.Supp. at 371. The Laffey court noted that plaintiffs' fee matrix was supported "with a barrage of data." Id.
 
 
 [11]
 Covington attorneys also submitted 1988, 1989, and 1990 hourly rate information for lawyers in more than a dozen local law firms used by plaintiffs in Lewis v. Brady, Civ.Action No. 82-0918 (D.D.C. Feb. 7, 1991), J.A. at I-113-17, as well as affidavits from four attorneys in Robles attesting to the reasonableness of annual increases of $10 per hour for the updated Laffey matrix. See J.A. at I-141-49
 
 
 [12]
 Plaintiffs requested current market rates rather than the rates that prevailed in the market when counsel actually worked on Covington to compensate for the delay in payment of their attorneys' fees. See Covington, 839 F.Supp. at 902
 
 
 [13]
 Although the Laffey matrix charts fees only up to 1988-89, the Robles district court updated the Laffey matrix by adding $10 per hour to the 1988-89 hourly rate of $220 and to the hourly rates of each succeeding year. See Covington, 839 F.Supp. at 900 (citing Robles, Civ.Action No. 84-3635, slip op. at 16 & n. 7)
 
 
 [14]
 The U.S. Attorney's Office developed its fee matrix by adding the Consumer Price Index increase for the Washington, D.C., metropolitan area to the prior year's rate and rounding upwards if the sum is within $3 of the next $5 multiple. See Covington, 839 F.Supp. at 900
 
 
 [15]
 Plaintiffs do not request any enhancements above the "lodestar" to compensate their attorneys for the risk of accepting contingency fee arrangements
 
 
 [16]
 The Supreme Court noted that the Senate Report accompanying the Civil Rights Attorneys' Fees Award Act of 1976 explicitly approved of the "appropriate standards" for awarding attorneys' fees set out in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir.1974). See Blum, 465 U.S. at 893, 104 S.Ct. at 1546 (quoting S.REP. NO. 1011, 94th Cong., 2d Sess. 6 (1976)). One of the several factors the court used to determine reasonable attorneys' fees in Johnson was the "experience, reputation, and ability of the attorneys." 488 F.2d at 718. And in Blum, the Supreme Court appeared to focus primarily on this factor. See 465 U.S. at 890 n. 4, 104 S.Ct. at 1545 n. 4 (noting years in which attorneys graduated from law school, years and general type of legal experience, and whether attorneys served as judicial law clerks); id. at 895 n. 11, 104 S.Ct. at 1547 n. 11 (noting lawyers' experience, skill, and reputation varies extensively)
 
 
 [17]
 In SOCM, the court approved of the district court's use of the Laffey matrix, a schedule of hourly rates based largely on years of experience. See SOCM, 857 F.2d at 1525. Attorneys would have to state their federal court experience in order to get Laffey rates
 
 
 [18]
 In fact, the District Court in Galloway v. Superior Court noted its dissatisfaction with the Laffey matrix in this regard: "The Court accepts as credible evidence the Matrix, but nonetheless would hope that a more complete breakdown and study of rates could be compiled for future use in attorneys' fee awards." Civ. Action No. 91-0644, slip op. at 4 n. 1
 
 
 [19]
 The dissenting opinion appears to challenge the District Court's findings that counsel in Sexcius and Galloway reduced their rates for non-economic reasons. However, the record clearly supports the District Court on this point
 Counsel in Galloway submitted an affidavit explaining that "[b]ecause my clients are unable to pay the rates prevailing in the community for complex federal litigation and are frequently unemployed, my rates vary from pure contingent fee to $200 per hour, and I rely to a great extent on court-awarded fees for my compensation." Second Affidavit of Vicki G. Golden, J.A. at III-50-51. The District Court determined that "[b]ecause this case involves both attorneys who practice privately and for profit but who give reduced rates to many clients, and attorneys who practice in public interest legal services organizations, SOCM is particularly relevant." Galloway, slip op. at 3, J.A. at III-14. The District Court found that "[plaintiffs' counsel] is exactly the type of private attorney who charges reduced rates to clients due to non-economic goals discussed in SOCM." Id. Counsel in Sexcius submitted an affidavit with similar explanations, stating that their "clients are unable to pay the rates prevailing in the community for complex federal litigation," and that they "charged plaintiffs a low hourly rate because their case was important and as teachers they could not afford the prevailing market rates." Declaration of Francine K. Weiss, J.A. at II-71. The District Court in Sexcius found that "[b]ecause plaintiffs' counsel charged plaintiffs this low $100 rate out of public interest motives, plaintiffs are entitled to collect the prevailing market rate, not merely the rate they actually charged plaintiffs." Sexcius, 839 F.Supp. at 921. This court does not disturb the factual findings of the district court when they are supported by the record.
 
 
 [20]
 In reviewing a case approved of in the Senate Report that accompanied the Civil Rights Attorneys Fees Award Act, the SOCM court noted that "Congress did not intend to use historical billing rates as a cap on fee awards." SOCM, 857 F.2d at 1523 (quotations omitted)
 
 
 [21]
 The District mentions in its brief that the market consists of those attorneys who litigate "employment discrimination and civil rights actions in the District of Columbia." Brief for the District of Columbia at 43. However, the point was not pressed in its briefs; nor did counsel attempt to argue the point when asked at oral argument about whether the District challenged the scope of the relevant market. In fact, counsel for the District suggested that this court need not reach that issue
 
 
 [22]
 Indeed, as noted by the Third Circuit, it makes little sense to narrow the market in the fashion suggested by the District in this case:
 Courts that try to establish public interest market rates by looking to the going rate for public interest work ... do not examine an independently operating market governed by supply and demand, but rather recast fee awards made by previous courts into "market" rates. Courts adopting this micro-market approach, therefore, engage in a tautological, self-referential enterprise.
 Student Pub. Interest Research Group v. AT&T Bell Laboratories, 842 F.2d 1436, 1446 (3d Cir.1988).
 
 
 [1]
 I assume arguendo that the applicants meet the skill and experience requirements. I part from the majority insofar as it, unlike the district court, relies on special interest recognition within the applicants' limited area of practice to evaluate their experience. Maj.Op. at 19 nn. 4-8. I would suggest that broader assessment such as that reflected in law directory listings like, for example, the Martindale-Hubbell Law Directory provides more probative "pieces of evidence that will enable the District Court to make a reasonable determination of the appropriate hourly rate." National Ass'n of Concerned Veterans v. Secretary of Defense (NACV ), 675 F.2d 1319, 1326 (D.C.Cir.1982). The Martindale-Hubbell ratings are derived from confidential surveys of members of the bar and, significantly, the judiciary and "take[ ] into consideration experience, nature of practice and qualifications relevant to the profession." 4 Martindale-Hubbell Law Directory XI (1994)
 
 
 [2]
 Unless otherwise specified, the term "district court" refers to both district judges who decided the three fee awards consolidated on appeal
 
 
 [3]
 NACV, 675 F.2d at 1324
 
 
 [4]
 The data submitted with the District's affidavit indicate that the Laffey rates significantly overstate the non-reduced market rates charged to fee-paying clients for employment discrimination and other civil rights cases in the District of Columbia, sometimes by more than $100 an hour. See, e.g., JA I-220-21, 243-44 (hourly rate of $150 compared to Laffey rates of $250 and $260); JA I-221-22, 247-48 (hourly rate of $150 compared to Laffey rates of $290 and $300). If the $150 figure accurately estimates the prevailing community rate for this litigation specialty, the bulk of the awards here is based on hourly rates overstated by more than $100 per hour. The difference amounts to more than $109,000 in additional fees for Schember and Gaffney, see Covington v. District of Columbia, 839 F.Supp. 894, 903 (D.D.C.1993) (996 hours at $260 per hour) and more than $100,000 in additional fees for Weiss and Barnett, see Sexcius v. District of Columbia, 839 F.Supp. 919, 929 (D.D.C.1993) (912 hours at $260 per hour)
 
 
 [5]
 Nothing in Save Our Cumberland Mountains, Inc. v. Hodel (SOCM ), 857 F.2d 1516 (D.C.Cir.1988) (en banc ), altered either the burden of proof imposed by the court's earlier opinions or who bears it. Indeed, the court expressly noted that "[h]enceforth, the prevailing market rate method heretofore used in awarding fees to traditional for-profit firms and public interest legal services organizations shall apply as well to those attorneys who practice privately and for profit but at reduced rates reflecting non-economic goals." Id. at 1524 (emphasis added). Although the court "commend[ed]" the use of the Laffey matrix in that case without evaluating it in any detail, id. at 1525, it bears note that SOCM involved a fee award under the Surface Mining Control and Reclamation Act. Id. at 1517. Fee awards under that statute are undoubtedly so few in number, at least compared with the type of litigation involved here, that use of the broad Laffey matrix may be by default the most accurate evidence of a reasonable hourly rate
 
 
 [6]
 See Covington, 839 F.Supp. at 897; Sexcius v. District of Columbia, 839 F.Supp. 919, 923 (D.D.C.1993); Galloway v. Superior Court of the District of Columbia, Civil Action No. 91-0644, Mem.Op. at 5, 1994 WL 162410 (D.D.C. Apr. 21, 1994) (reprinted in JA III-12, III-16)
 
 
 [7]
 I do not question the evidence indicating that some of the lawyers in these cases have reduced their rates for non-economic reasons both in the past and here. I do dispute, however, that a lawyer's billing history can be disregarded in favor of a rate that he has never commanded. For example, a lawyer who normally charges $120 per hour to paying clients but agrees to reduce that rate to $100 per hour for non-economic reasons would not, in my view, be entitled under NACV or SOCM to recover a market rate of $150 per hour
 
 
 [8]
 Although the district court in Covington concluded that the District had produced insufficient evidence that counsel's ordinary billing rate of $150 per hour was below market value, 839 F.Supp. at 897, that conclusion was premised on the incorrect market of "complex federal matters," id. at 898